ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
MAR 13 2006
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARBITRAGE TRADING, LLC, by and through ROBERT GUNTHER as Trustee For ROBERT AND JAYNE GUNTHER 1999 REVOCABLE TRUST, Plaintiff, | ) | |
| v. | ) | DOCKET NO: 06-202 T |
| THE UNITED STATES OF AMERICA, by and through its agent, the INTERNAL REVENUE SERVICE, Defendant. | ) | |

---

**COMPLAINT FOR READJUSTMENT OF PARTNERSHIP ITEMS UNDER CODE § 6226**

---

David D. Aughtry, Esq.
Chamberlain, Hrdlicka, White, Williams & Martin
191 Peachtree Street, N.E., Ninth Floor
Atlanta, Georgia 30303
Telephone: (404) 659-1410

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ARBITRAGE TRADING, LLC, by and through ROBERT GUNTHER as Trustee For ROBERT AND JAYNE GUNTHER 1999 REVOCABLE TRUST,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **DOCKET NO: __________** |
| **THE UNITED STATES OF AMERICA, by and through its agent, the INTERNAL REVENUE SERVICE,** | ) | |
| **Defendant.** | ) | |

---

**COMPLAINT FOR READJUSTMENT OF PARTNERSHIP ITEMS UNDER CODE § 6226**

---

**Nature of Action**

1. This is a federal income tax partnership proceeding brought under Appendix F of the Rules of the United States Court of Federal Claims and Section 6226(a) of the Internal Revenue Code of 1986 (as amended) (26 U.S.C.: "Code") to contest the Internal Revenue Service findings in the Notice of Final Partnership Administrative Adjustment dated October 13, 2005 ("FPAA").

2. This case is indirectly related to *Jade Trading, LLC. et al. v. United States*, Dkt. No. 03-21648, which has been tried, briefed, and submitted to Judge Mary Ellen Coster Williams. RCFC 4.2(b).

**Statement of the Claim**

3. Arbitrage Trading, LLC ("Arbitrage Trading"), acting through one of its notice partners, Robert Gunther ("Mr. Gunther") as Grantor for The Robert and Jayne Gunther 1999

Revocable Trust ("Gunther Revocable Trust"), hereby seeks: (i) a refund (with interest provided by law) of the $2,371,502.00 in federal income taxes and penalties illegally collected by the Internal Revenue Service ("IRS"); (ii) a determination of the seven substantive partnership items set forth in the FPAA; and (iii) a determination of the partnership level defenses relating to the penalties asserted in the FPAA. The FPAA was issued by the IRS Technical Services Territory Manager, Midwest Area, 316 North Robert Street, St. Paul, Minnesota 55101. The adjustments stated in the FPAA relate to the year ended December 31, 1999. The IRS issued a copy of the FPAA to Mr. Gunther as grantor for the Gunther Revocable Trust. The FPAA is attached as Exhibit "A" and incorporated herein by reference.

4. The FPAA erroneously, arbitrarily, and capriciously seeks to:

a. Disallow the Gunther Revocable Trust's capital contribution to Arbitrage Trading in 1999;

b. Disallow a distribution of property other than money from Arbitrage Trading to the Gunther Revocable Trust in 1999;

c. Reduce the Gunther Revocable Trust's claimed outside partnership basis to $0.00;

d. Assert additional partnership income in the amount of $121,880.00; and

e. Impose alternative "accuracy-related penalties" under Code § 6662.

5. Further, the FPAA states seven substantive contentions purportedly justifying the IRS's actions with respect to partnership and non-partnership items. Additionally, the FPAA asserts a series of alternative penalties under Section 6662 (without considering the reasonable cause provisions of Section 6664). The Gunther Revocable Trust disputes all of those assertions and explanations.

**The Parties**

6. Arbitrage Trading is a limited liability company formed under the laws of the State of Delaware. It is treated as a partnership for federal income tax purposes. Arbitrage Trading's taxpayer identification number is 13-4077918, and its principal place of business is 68 Carman Avenue, Cedarhurst, New York 11516. Arbitrage Trading filed its United States Partnership Return (Form 1065) for 1999 with the Internal Revenue Service Center in Holtsville, New York.

7. The Gunther Revocable Trust is a member and notice partner of Arbitrage Trading.

8. Mr. Gunther, as grantor of the Gunther Revocable Trust, is an indirect partner of Arbitrage Trading pursuant to Code § 6231(a)(10). His mailing address is 800 South Osprey Avenue, Sarasota, Florida 34236.

9. Both Mr. Gunther and the Gunther Revocable Trust maintain an interest in the outcome of this action because: (a) partnership items attributable to the Gunther Revocable Trust have not become non-partnership items through the occurrence of any event described in Code § 6231(c); and (b) the period of limitations for assessment of partnership items against the Gunther Revocable Trust has not expired.

10. Arbitrage Trading's tax matters partner is Sentinel Advisors, LLC ("Sentinel Advisors"). Sentinel Advisors' current address is 68 Carman Avenue, Cedarhurst, New York 11516.

11. Sentinel Advisors, as tax matters partner, has not filed a complaint for readjustment of partnership items within the period specified in Code § 6226(a).

12. The Defendant is the United States of America with respect to the claims and actions by its agent, the IRS, an executive agency within the Department of Treasury. Service of process may be made on Defendant through the Attorney General at the Tax Division of the Department of Justice and upon such other offices or individuals as may be required.

**Jurisdiction**

13. This Court has jurisdiction over this claim pursuant to 28 U.S.C. § 1508 and 26 U.S.C. § 6226(b).

**Deposit**

14. On March 10, 2006, Mr. Gunther deposited $2,371,502.00 with the IRS field office in Sarasota, Florida *via* hand delivery. The amount deposited satisfies the jurisdictional prerequisite stated in Code § 6226(e). Specifically, the deposit equals "the amount by which the tax liability of the [Gunther Revocable Trust] would be increased if the treatment of partnership items on the partner's return were made consistent with the treatment of partnership items on the partnership return, as adjusted by the [FPAA]."

**Assignments of Error**

15. The FPAA issued by the IRS erred in the following particulars:

a. In attempting to do indirectly what the IRS admits it cannot do directly;[1]

b. In seeking to substitute pejoratives and self-serving labels for the results permitted by law, simply because the results permitted by law do not favor

---

[1] The heart of the IRS objection is that neither the Gunther Revocable Trust nor Arbitrage Trading reduced the outside basis in partnership interests by the amount of a potential obligation to deliver Euros in the future under a call option held by an unrelated third party. As recently as June 23, 2003, the IRS admitted that the Tax Court correctly held in *Helmer v. Commissioner*, T.C. Memo 1975-160 that such an option results in NO BASIS REDUCTION. *Cf.*, Temp. Reg. § 1.752-6T (IRS attempt to retroactively reverse *Helmer*). Based on the holding in *Helmer*, the returns filed by Arbitrage Trading and the Gunther Revocable Trust treated that basis correctly.

the IRS in this particular case;

c. In firing a blunderbuss of alternative contentions that confirm that no single authority supports the IRS's conclusion;

d. In consistently seeking to circumvent the rule of law properly enacted by Congress – including, *inter alia*, Code Sections 701, 704, 722, 732, 752, 761, 1012, 6221, 6226, 6664, 7701, and various elements of the United States Constitution;

e. In asserting that Arbitrage Trading was somehow a sham despite its extensive trading activity and numerous non-tax purposes;

f. In disregarding and disallowing the formation of Arbitrage Trading, the partners' acquisition of any interest therein, and the resultant federal income tax deductions, properly calculated by the Gunther Revocable Trust, based on erroneous allegations that:

(i) Arbitrage Trading was formed or used solely for tax avoidance;

(ii) Arbitrage Trading had no business purpose other than tax avoidance, and that

(iii) the partners' purchase of offsetting options and transfer of those options to the partnership in return for a partnership interest; the partnership's purchase of assets and subsequent distribution of those assets to the partners in complete liquidation of the partnership interests; and the subsequent sale of those assets to generate a loss had no business purpose other than tax avoidance, lacked economic substance, and, in fact and substance, constituted

an economic sham for federal income tax purposes;

g. In asserting that, under Treas. Reg. § 1.701-2, Arbitrage Trading was a sham, lacked economic substance, and was formed in connection with a transaction or transactions, a principal purpose of which was to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code, and, as a consequence, that:

(i) The partnership should be disregarded and all transactions engaged in by the partnership should be treated as engaged in directly by the partners including the determination that the assets acquired by Arbitrage Trading—including but not limited to foreign currency options—were acquired directly by the partners;

(ii) The foreign currency options contributed to or assumed by Arbitrage Trading are treated as never having been contributed to or assumed by Arbitrage Trading, and any gains or losses realized by Arbitrage Trading on the options are treated as having been realized by its partners;

(iii) The partners of Arbitrage Trading should be treated as not being partners of Arbitrage Trading; and

(iv) Contributions to Arbitrage Trading will be adjusted to reflect clearly the partnership's or partner's income;

h. In violating the United States Constitution in at least three different ways by adopting and asserting here the most criticized regulation in the last 30

years, Treas. Reg. § 1.701-2;

i. In applying certain broad, ambiguous, and unconstitutionally vague phrases in Treas. Reg. § 1.701-2 without regard for the principles embedded in Examples 1, 9, and 10 of that regulation—principles that confirm the correctness of Plaintiff's returns;

j. In asserting that neither Arbitrage Trading nor its partners entered into the options positions in foreign currency or stock with a profit motive for purposes of Code § 165(c)(2);

k. In further asserting that Arbitrage Trading is an individual subject to the limitation on deductibility of losses for purposes of Code § 165(c)(2);

l. In asserting that, even if the currency options were treated as contributed to Arbitrage Trading, the amount treated as contributed by the partners under Code § 722 is reduced by the amounts received by the contributing partners from the sale of call options to the same counter-party, and as a consequence, the basis of the contributed options is reduced, both in the hands of the contributing partners and Arbitrage Trading, and in disallowing any corresponding increases in the outside basis in Arbitrage Trading resulting from the contributions of the foreign currency options;

m. In asserting that, under Code § 723, the adjusted bases of the long call positions, zero coupon notes, and other contributions by the partners to Arbitrage Trading has not been established in an amount greater than zero;

n. In asserting that, in the case of a sale, exchange, or liquidation of the Arbitrage Trading partners' partnership interests, neither the partnership

nor the partners have established that the bases of the partners' partnership interest were greater than zero for purposes of determining gain or loss to such partners from the sale, exchange, or liquidation of such partnership interest;

o. In further asserting that the 40% penalty attributable to a gross valuation misstatement applies under Code §§ 6662(a), 6662(b)(1), 6662(c) and 6662(h);

p. In asserting alternatively that the 20% penalty attributable to negligence or disregard of rules and regulations applies as provided by Code §§ 6662(a), 6662(b)(2), and 6662(c);

q. In asserting alternatively that the 20% penalty attributable to a substantial understatement of income tax applies under Code §§ 6662(a), 6662(b)(2), and 6662(c) and that the 20% penalty for substantial understatement of income tax for tax shelter transactions applies; and

r. In asserting alternatively that the 20% penalty for substantial valuation misstatement applies under Code §§ 6662(a), 6662(b)(2), and 6662(c).

**Facts**

16. The facts and mixed matters of fact and law on which Plaintiffs rely are as follows:

a. Mr. Gunther is an out-going, affable, big-risk, big-loss, big-reward entrepreneur.

b. He was attracted to the Euro derivatives trading urged by Sentinel Advisors, LLC and endorsed by people he had long known well for one

overriding reason: in addition to the tax benefits available through other avenues, it offered high-risk/higher-reward multiple returns.

c. In 1999, Mr. Gunther needed to reinvest and diversify his capital which was concentrated in the United States. At the time, the United States' economy was in its unprecedented 10th year of expansion, and many investors were concerned about a perceived equity "bubble."

d. Therefore, Mr. Gunther and his advisors were receptive to Sentinel Advisors' proposal that foreign currency derivatives offered an opportunity for large multiples independent of U.S. equity markets.

e. With the assistance of his business advisors, Mr. Gunther evaluated a number of investment opportunities, several of which provided both the potential for profit and the potential for tax benefits.

f. One such investment was presented by Ari Bergmann, the managing member of Sentinel Advisors, which is a hedge fund that specialized in investing in highly leveraged financial derivative instruments.

g. Located in New York, NY, Sentinel Advisors managed upwards of $150 million in assets in a wide variety of investment vehicles.

h. Sentinel Advisors proposed a highly leveraged investment in Euros and other foreign currencies using financial derivative instruments such as options designed to profit on incremental moves of the underlying currencies against the United States dollar as well as each other.

i. Mr. Gunther and his advisors met with Mr. Bergmann on several occasions to discuss the Mr. Bergmann's investment philosophy.

j. During those meetings, Mr. Bergmann presented Mr. Gunther and his advisors with detailed descriptions of the various derivative instruments Sentinel used to create high-risk/higher-reward investment portfolios.

k. The credentials of Sentinel and its members impressed Mr. Gunther. Sentinel's principals had extensive foreign currency trading experience with the major New York banks such as Bankers Trust and Goldman Sachs.

l. Over the next few months, Mr. Gunther continued discussions with the principals at Sentinel regarding their investment philosophy.

m. At the same time, Mr. Gunther performed due diligence regarding Sentinel Advisors, Ari Bergmann, and the Euro.

n. Mr. Gunther's due diligence confirmed that the Euro was substantially undervalued vis-à-vis the dollar. This conclusion was substantiated by the general business press, which was reporting that, in light of the improving overall economic conditions in Europe, many foreign analysts and traders on Wall Street believed the Euro was primed for a positive move against the dollar.

o. Sentinel presented Mr. Gunther with a two-part investment program. Part one employed highly leveraged Euro call options to provide significant profit potential on relatively small changes in the Euro's exchange rate against the dollar. Part two employed exotic options such as knock-out options to create high risk/higher reward trading positions.

p. Sentinel provided Mr. Gunther with investment literature that explained how exotic options, such as knock-out options, could provide returns upwards of 30:1.

q. The initial investment involved the purchase and sale of bullish Euro call options. Mr. Gunther was told these options could at least double his investment, *i.e.*, provide a 100% return. Sentinel advised Mr. Gunther that these options could provide significantly higher returns by actively trading them as the Euro appreciated against the dollar.

r. During the discussions with Sentinel, the Euro continued to appreciate against the dollar, consistent with Sentinel's view and that of many investment houses.

s. On August 31, 1999, the Gunther Revocable Trust bought a one year, European-style Euro/U.S. dollar ("EUR/USD") call option for a premium of $9,000,070 from AIG International ("Purchased Euro Option"). AIG International (now AIG Trading Group, Inc.) is a first tier market maker for spot trades, forwards, and options in both developed and emerging market currencies.

t. Under the Purchased Euro Option, which had a strike price of 1.077500.00, Gunther Revocable Trust held the right to purchase EUR 170,210,000 in exchange for U.S. $183,401,275.00 on the expiration date of the option.

u. Also on August 31, 1999, the Gunther Revocable Trust sold a one year, European-style, EUR/USD call option for a premium of $8,910,051.00 to

AIG International ("Sold Euro Option"). The Sold Euro Option, which had a strike price of 1.078500, provided AIG with the right to purchase EUR 170,210,000 for U.S. $183,571,485.00.

v. The two Euro options were separate and distinct in nature.

w. The Sold Euro Option was a separate asset owned by AIG.

x. At all times during their dealings, AIG was an unrelated arm's length third-party relative to the Gunthers, the Gunther Revocable Trust, and Arbitrage Trading, and its members – none of whom owned any interest nor held any positions in AIG.

y. Each Euro option was separately priced and valued.

z. Each of the two Euro options could be separately bought, sold and/or assigned (with the consent of the counterparty) – without altering the other option.

aa. Each Euro option could be separately replaced with a new option and the holder could thereby "leg-in" a different set of spread options – without altering the other option.

ab. Each Euro option could be separately closed and the holder could thereby "leg-out" of the set of spread options – without altering the other option.

ac. Again, consistent with Mr. Gunther's intent to actively trade these initial option positions, Mr. Gunther also agreed to pay AIG a trading fee equal to $49,500. This fee allowed the Gunther Revocable Trust and Arbitrage Trading to trade the options without incurring substantial bid/ask spreads for each trade. A bid/ask spread is a type of commission charged by the

market maker, here AIG, to cover the substantial costs incurred in setting up the option positions.

ad. This trading fee was negotiated between Ari Bergmann and AIG to allow the frequent trading of the initial options to capture incremental profits from these highly leveraged positions. Those profits and that appreciation were intended to leverage additional trading.

ae. The Sold Euro Option was a contingent obligation under which the Gunther Revocable Trust would not be liable unless and until AIG exercised the option. Neither the Gunther Revocable Trust nor Arbitrage Trading (to whom the option was later transferred) was ever called upon to fulfill this contingent obligation.

af. Along the way, Sentinel advised Mr. Gunther that, in order to actively trade these options and to engage in more sophisticated exotic options transactions—which would enable him to reap higher returns, it would be necessary to contribute the existing options to a hedge fund along with additional cash.

ag. Based on Sentinel's representations, Mr. Gunther understood that Sentinel's investment program offered a number of separate sets of opportunities to make a great deal of money if Sentinel's bullish bet on the Euro was right, including:

(i) Mr. Gunther could at least double his money on holding certain conventional Euro options;

(ii) Mr. Gunther could increase that rate of return by actively trading the options;

(iii) Mr. Gunther could reap substantially larger returns by trading exotic options such as knock-out options; and

(iv) Mr. Gunther could also profit from the hedge fund trading in individual foreign currencies, more vanilla foreign currency positions, and equities.

ah. Based upon the favorable responses Mr. Gunther received regarding Sentinel's reputation and the general consensus that the Euro would likely rebound, Mr. Gunther and his advisors asked Mr. Bergmann if he invested his own money in similar derivative instruments.

ai. Mr. Bergmann confirmed that he had, and he showed Mr. Gunther summaries of actual trades where he and other investors earned substantial returns using combinations of options on the Euro.

aj. In the end, Mr. Gunther decided to invest a portion of his assets with Mr. Bergmann, promising substantially more investable assets were Mr. Bergmann to trade successfully.

ak. Mr. Gunther was told that, as a practical matter, the active trading of conventional options and exotic options were best handled through a professionally managed partnership for a number of reasons.

al. From his previous knowledge and experience, Mr. Gunther knew that investment and hedge funds were normally conducted through a partnership for a host of reasons.

am. The structure of the partnership contained a number of features that made a great deal of sense to Mr. Gunther.

an. Mr. Gunther particularly liked that Sentinel itself would be a member of the LLC/partnership and would serve as the managing member, so that those who were the most knowledgeable about the trading would participate in the success.

ao. For the same reason, Mr. Gunther liked the fact that Sentinel not only would contribute its own cash to the partnership but would be motivated by the promise of a very handsome success bonus. As the Managing Member of Arbitrage Trading, Sentinel was entitled to 20% of the Net Capital Appreciation enjoyed by the fund. In Mr. Gunther's estimation, this "incentive allocation" would sufficiently motivate Sentinel to place Arbitrage Trading into profitable investments. After all, for every dollar of profit earned by Arbitrage Trading, Sentinel would take home 20 cents.

ap. Mr. Gunther was also told that, even if the Euro dropped, the tax laws provided some downside protection.

aq. Mr. Gunther knew from experience that many investments carried potential tax advantages.

ar. From his experience through the years as a successful businessman and investor, Mr. Gunther knew that he needed to rely upon capable people to handle the intricacies of the tax laws. He further knew that virtually all business transactions can and should be structured with tax consequences in mind.

as. Consistent with the effort to maximize profits, Mr. Gunther negotiated reductions in various costs, including the consulting fees with New Vista, an affiliate of Sentinel.

at. As of October 6, 1999, the Purchased Euro Option was appreciating and Mr. Gunther was eager to get into Arbitrage Trading to allow Sentinel to leverage the existing positions into larger multiples through the more sophisticated trading of exotic options.

au. On or about October 6, 1999, as the Euro was again rising against the dollar, the Gunther Revocable Trust contributed its Purchased Euro Option and assigned its rights under the Sold Euro Option to Arbitrage Trading, a limited liability company treated as a partnership for federal tax purposes.

av. In exchange for contributing its Purchased Euro Option and $45,000.00 in cash, the Gunther Revocable Trust received non-managing member interest in Arbitrage Trading.

aw. As a result, the Gunther Revocable Trust became a capital member in a capital intensive limited liability company agreement.

ax. The Gunther Revocable Trust contributed the Purchased Euro Option to Arbitrage; the Gunther Revocable Trust did not and could not contribute the Sold Euro Option to Arbitrage Trading because the Trust did not own that asset – AIG did.

ay. As of October 6, 1999, the members of Arbitrage Trading, LLC consisted of the following:

| Name | Type of Member |
|---|---|
| Sentinel Advisors, LLC | Managing Member |

| | |
|---|---|
| Banque Safra | Non-Managing Member |
| Highpoint Tower Technology, Inc. | Non-Managing Member |
| Gunther Revocable Trust | Non-Managing Member |

az. Unfortunately, less than two weeks after joining Arbitrage Trading, the Euro suddenly reversed its climb against the dollar and began a steady decline, which lasted through October 2000.

ba. The sudden reversal occurred while Arbitrage Trading held a majority of its assets in cash as well as the highly leveraged positions contributed by the Gunther Revocable Trust. As a result of the decline, those positions declined in market value, precluding Sentinel from actively trading them for profit.

bb. Arbitrage Trading, consistent with its profit motive, reduced its exposure to the Euro by conserving cash and reducing the level of its trading.

bc. During 1999, Arbitrage Trading incurred net losses and deductions of $121,880.00, of which $46,724.00 was allocated to the Gunther Revocable Trust.

bd. The partnership continued trading well into 2000 even after Mr. Gunther exited the partnership.

be. The partnership was bona fide. Further, each partnership transaction or series of related transactions were entered into for a substantial business purpose.

bf. Arbitrage Trading was formed to permit its partners to conduct business jointly, including investment activities through a flexible economic arrangement without incurring an entity-level tax.

bg. At all relevant times, Arbitrage Trading has been a legally recognized entity under Delaware law.

bh. Following its formation in 1999 and continuing into 2000, Arbitrage Trading engaged in business activity in its name and on its own behalf as a limited liability company.

bi. Investing through a partnership such as Arbitrage Trading served the important business purposes that normally cause people to form limited liability companies and partnerships (*e.g.*, increasing returns through centralized control and investment decisions, leverage, collateral, administrative efficiency, consolidated cost reduction). Additionally, formation of a partnership was essential because Arbitrage's trading philosophy was consistent with that of a hedge fund. As a matter of industry practice, hedge funds are organized as partnerships or limited liability companies.

bj. Contrary to the assertion in the FPAA, the tax consequences to each partner of partnership operations and of transactions between the partner and the partnership accurately reflected such partner's economic arrangement and clearly reflected such partner's income (individually and collectively) under the law.

bk. The partnership was formed for the express purpose of making money from trading. Mr. Gunther would not have participated but for the opportunity to make money and to diversify his investment positions through currency trading. The partnership was not formed or availed of in

a manner inconsistent with the intent of Subchapter K. Specifically, Arbitrage Trading was not formed, used, or associated with any transaction principally designed to reduce substantially the present value of the partners' aggregate federal tax liability.

bl. During 1999 and 2000, Arbitrage: (i) entered into enforceable binding option contracts in its own name as a party; (ii) maintained trading accounts in its own name at Salomon Smith Barney; (iii) acquired foreign currency positions in its own name; (iv) bought foreign currency positions in its own name; (v) sold foreign currency positions in its own name; (vi) acquired equities in its own name; and (vii) conducted business as a functioning, existing limited liability company.

bm. Arbitrage Trading made all filings required by law. It had a separate bank account in its name. It traded and otherwise did business with unrelated parties in its name. In all respects, it conducted itself as a business entity, distinct from its partners.

bn. The Gunther Revocable Trust's Purchased Euro Option and Sold Euro Option were separate and distinct properties for several reasons. For example, under the contractual terms of each trade confirmation: (i) each constituted separate property in the form of contract rights under state law; (ii) each contract was separately enforceable under state law; (iii) one contract could have been embraced and the other disavowed under debtor/creditor rights; (iv) each Purchased Euro Option and Sold Euro Option was independently transferable and assignable; (v) each Purchased

Euro Option and Sold Euro Option had a different strike price; and (vii) each purchased and Sold Euro Option had a different notional amount. In addition, since each Purchased Euro Option and Sold Euro Option constituted a Code § 988 transaction, they cannot be integrated for income tax purposes.

bo. Arbitrage Trading and its partners also engaged well-qualified advisors to evaluate the financial merits of the investment and the proper tax treatment of the transactions in issue.

bp. Arbitrage Trading and its partners did not attempt to limit the scope of the advisors' research or investigation. Mr. Gunther secured tax opinions from his respected tax advisors, who informed him that the tax treatment of the losses from and transactions with Arbitrage Trading, as reported on the respective returns, were more likely than not correct.

bq. In its temporary regulation (§ 1.752-6T) dated June 23, 2003, the IRS admitted that Arbitrage Trading and its partners were correct with respect to the central point the IRS now labels as an abuse, *i.e.*, the rule of law that the IRS itself established in *Helmer v. Commissioner*, T.C. Memo 1975-160, 34 T.C.M. 727 (1975), holding that contingent obligations to deliver property under an option do not constitute liabilities that affect basis under Code § 752.

br. Arbitrage Trading filed its 1999 return in good faith with due and reasonable regard for the income tax rules and regulations. In so doing, Arbitrage Trading and its partners relied on qualified tax professionals

who were in possession of all pertinent facts when the return was filed and whom Arbitrage and its partners believed when they opined that the position taken was more likely than not the correct position. The actions undertaken by Arbitrage Trading and its partners meet and exceed the ordinary care protected by Code §§ 6662 and 6664 in complying with the income tax rules and regulations. Neither Arbitrage Trading nor its partners were negligent; nor did either act with intentional disregard of the rules or regulations under Code § 6662.

bs. Neither the value nor the adjusted basis of any property claimed on Arbitrage Trading's 1999 federal income tax return was 400% or more of the correct amount, nor was a price paid for any property or services (or for the use of property) claimed on the return in connection with any transaction between persons described in Code § 482 equal to 400% or more (or 25% or less) of the amount determined under Code § 482 to be the correct amount of such price. All transactions reflected on the returns were reported at amounts based on trading transactions with unrelated parties. No amounts on the returns were determined by valuation. Thus, the 40% valuation misstatement penalty is not applicable to Arbitrage Trading or its partners.

bt. Neither the value nor the adjusted basis of any property claimed on Arbitrage Trading's 1999 federal income tax return was 200% or more of the correct amount, nor was a price paid for any property or services (or for the use of property) claimed on the return in connection with any

transaction between persons described in Code § 482 equal to 200% or more (or 50% or less) of the amount determined under Code § 482 to be the correct amount of such price. Thus, the 20% valuation misstatement penalty is not applicable to Arbitrage Trading or its partners.

bu. Arbitrage Trading had no substantial understatement of its income tax. Moreover, Arbitrage Trading and any transactions at issue are not tax shelters as defined by Code. Code § 6662(d)(2)(C) or (D). Even if a substantial understatement of income tax were ultimately determined to be due, there was substantial authority for the treatment of all items on the 1999 return of Arbitrage Trading and each partner had a reasonable basis for believing that the tax treatment of such item was more likely than not the proper treatment. Furthermore, all items were disclosed on the appropriate return and there was a reasonable basis for the tax treatment of each item.

bv. In all events, no penalty can or should be applied against Arbitrage as an entity or against its partners since all concerned proceeded in good faith based upon reasonable cause within the meaning of Code § 6664(c).

17. Defendant's position stated in the FPAA relies upon the language of Treas. Reg. § 1.701-2(a) and (b) that:

a. Contradicts, *inter alia*, the accurate analysis and conclusions codified in Treas. Reg. § 1.701-2(d), Examples 1, 9, and 10;

b. Creates internal inconsistencies, ambiguities, and unconstitutional vagueness;

c. Seeks to circumvent, ignore, limit, restrict, and/or repeal various statutes enacted by Congress and thereby violates the legislative element of the Separation of Powers doctrine;

d. Seeks to unilaterally reverse precedent adopted by the judiciary and thereby violates the Separation of Powers doctrine confirmed in, *inter alia*, *Bankers Trust of New York v. United States*, 225 F.3d 1368, 1376 (Fed.Cir. 2000) (*citing Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803); and

e. Is otherwise invalid, null, and void.

18. To the extent any part of Treas. Reg. § 1.701-2 is valid or relevant, Defendant's regulation confirms by way of examples in subsection (d) that Arbitrage Trading must be recognized as a valid partnership for federal tax purposes:

a. In Example 1, the parties chose a partnership format (there a limited partnership, here a limited liability company) as a means of providing one of the partners with limited liability.

b. Defendant confirms in Example 1 that Congress intended Subchapter K to "permit taxpayers [such as the members of Arbitrage Trading] to conduct joint business activity through a flexible economic arrangement without incurring an entity level tax."

c. In Example 1, Treas. Reg. § 1.701-2(d), Defendant confirms that even though one partner alone "retained, indirectly, substantially all of the benefits and burdens of ownership of the property [that 99% partner contributed], the decision to organize and conduct business through [a

partnership] under these circumstances is consistent with this intent [under Subchapter K]."

d. Further, Defendant confirms in Example 1 of its regulation that, "on these facts [*i.e.*, formation of a limited liability entity as a means of limiting liability for the 99% partner], the requirements of [Treas. Reg. § 1.701-2] (a)(1), (2), and (3) are satisfied."

e. Defendant's regulation then concludes in mandatory terms that "[t]he Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction."

19. Examples 9 and 10 of Defendant's Treas. Reg. § 1.701-2(d) also require recognition of Arbitrage Trading, LLC.

a. In Example 9, one of the partners in partnership PRS decided to withdraw, which is consistent with the actions of several members of Arbitrage Trading.

b. The partnership agreement in the Example permits the withdrawing partner to receive cash or securities upon withdrawal—a determination that is retained by the managing member under the Arbitrage Trading Operating Agreement.

c. As here, the withdrawing partner's outside basis in his partnership interest ($100x in the example) is significantly greater than the partnership's inside basis ($20x) in the securities the partnership chose to distribute.

d. Defendant's Example 9 recognizes that, as here, Code Section 732(b) attributes the withdrawing partner's basis in his partnership interest

($100x) to the securities distributed to him. As here, the withdrawing partner may then sell those securities and recognize a substantial loss.

e. As here, the partnership (PRS) chose to make no election under Code § 754 adjusting the partnership's basis in its remaining assets.

f. Defendant confirms in Example 9 that the tax consequences flow from the "electivity" Congress injected into Code § 754, that the transaction is deemed to clearly reflect income, and that the Commissioner cannot recast the transaction even though Example 9 specifies the principal purpose of the withdrawing partner, "A", and PRS as follows:

> In selecting the assets to be distributed, A and P had a principal purpose to take advantage of the facts that (i) A's basis in the Securities shall be determined by reference to A's basis in its partnership interest under section 732(b), and (ii) because PRS will not make an election under Section 754, the remaining partners of PRS will likely enjoy a federal tax timing advantage (i.e., from the $80x of additional basis in its assets that would have been eliminated in the Section 754 election had been made) that is inconsistent with proper reflection of income under paragraph (a)(3) of this section.

g. Having said that, Defendant then confirms that the tax treatment is proper there. Therefore, it must also be proper here.

h. Defendant's Example 10 confirms the exact same conclusions, namely that the same tax treatment flows by operation of law under Code § 732(b) even where the principal purpose is to shift basis; that various aspects of Subchapter K (specifically including Section 732) necessarily distort income; and that:

> the application of section 732 to this transaction will be treated as satisfying the proper reflection of income

> standard under paragraph (a)(3) of this section. The Commissioner therefore cannot invoke paragraph (b) of this Section to recast the transaction.

i. The positions urged by Defendant in this case also contradict the Defendant's historic construction and application of the word liability for purposes of Code § 752 and other determinations of basis.

(i) That contradiction converts the historic clarity into inconsistencies, ambiguities, and unconstitutional vagueness.

(ii) Specifically, Defendant offsets the Euro options the Gunther Revocable Trust sold against the Euro options it purchased. As a result, Defendant reduces the basis of the options in the hands of Gunther Revocable Trust.

(iii) The obligations under the sold options depended upon the future determination by the counterparty, which determination in turn depended upon, *inter alia*, future market fluctuations, *etc*.

(iv) Historically, Defendant established and publicized that every liability is an obligation but not every obligation is a liability, and that an obligation does not rise to the level of a liability unless it is fixed (*i.e.*, not contingent upon some future event).

j. Mr. Gunther and his advisors specifically relied upon Defendant's historic construction to their (potential) detriment.

k. As a matter of fundamental fairness and the duty of consistency, Defendant must be estopped from converting its prior clear construction

into an indecipherable ambiguity inviting the facile application here of "heads the Commissioner wins, tails the citizen loses."

20. Arbitrage Trading reported every item on its U.S. Partnership Return for 1999 in good faith based upon reasonable cause. Further, substantial authority existed for each of the positions taken and Arbitrage Trading reasonably believed those positions were more likely than not correct. Therefore, no penalties can nor should be applied.

a. Every position Arbitrage Trading took was correct.

b. By regulation, limited liability companies are treated as partnerships for federal tax purposes unless they elect out of that treatment.

c. The assets contributed to Arbitrage Trading by its members were properly reported in the capital section at their net fair market value.

d. The assets distributed by Arbitrage Trading to its members were properly reported based on their internal cost basis to the partnership/LLC.

e. The identity of the members and their partnership interests conformed to the Operating Agreement that governed the ownership by the members and the operation of the entity.

f. To the extent Defendant treats certain of the items that relate to some but not all of the member/parties as "partnership items," all of the affected member/partners justifiably relied both upon their long-time trusted advisors and those presented to them as having specialized knowledge of the treatment of foreign currency trading such as this.

WHEREFORE, Plaintiffs pray after due proceedings:

(i) For a redetermination of the FPAA removing all adjustments to income, losses, distributions, basis, and penalties;

(ii) For a recovery of the $2,371,502.00 in taxes and penalties deposited (plus any interest permitted by law);

(iii) That Defendant bears the proof as to all issues; and

(iv) That the Court grant such other and further relief as it deems appropriate.

Respectfully submitted,

David D. Aughtry

COUNSEL FOR PETITIONER

Chamberlain, Hrdlicka, White,
Williams & Martin
191 Peachtree Street, NE, Ninth Floor
Atlanta, Georgia 30303
(404)659-1410
(404)659-1852 Facsimile

213506.5
003424-000008 3/13/2006