

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RECEIVED

SEP 1 2 2003

OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JADE TRADING, LLC, by and through ROBERT W. ERVIN AND LAURA KAVANAUGH ERVIN on behalf of ERVIN CAPITAL, LLC, Partners Other Than the Tax Matters Partner, | §<br>§<br>§<br>§<br>§<br>§ |
| Plaintiffs, | §<br>§ |
| v. | §<br>§ |
| UNITED STATES OF AMERICA, by and through its agent, the INTERNAL REVENUE SERVICE, | §<br>§<br>§<br>§ |
| Defendant. | §<br>§ |

NO. _____

## 03-2164T

## COMPLAINT FOR READJUSTMENT OF PARTNERSHIP ITEMS UNDER CODE § 6226

### Nature of Action

1.     This is a federal income tax partnership proceeding brought under Appendix F of the Rules of the United States Court of Federal Claims and Section 6226(a) of the Internal Revenue Code of 1986 (as amended) (26 U.S.C.: "Code") to contest the Internal Revenue Service findings in the Notice of Final Partnership Administrative Adjustment dated April 15, 2003 ("FPAA").

### Statement of the Claim

2.     Jade Trading, LLC, through one of its notice partners, Ervin Capital, LLC (a flow-through entity owned by Robert W. Ervin), hereby seeks (i) a refund (with interest provided by law) of the $4,110,812.00 in federal income taxes illegally collected by the Internal Revenue Service ("IRS"), (ii) a determination of the five substantive partnership

-1-

items set forth in the FPAA, and (iii) a determination of the partnership level defenses relating to the penalties asserted in the FPAA. That FPAA was issued by the Internal Revenue Service Director, Field Compliance Area 6, Small Business/Self-Employed, Detroit, Michigan 48266. The adjustments relate to the year ended December 31, 1999. The IRS issued a copy of the FPAA to Robert W. Ervin and Laura Kavanaugh Ervin.[1] It is attached as Exhibit A and incorporated herein by reference. The IRS also issued a separate copy of the FPAA to Ervin Capital, LLC. It is attached as Exhibit B and incorporated herein by reference.

3.    The FPAA asserts additional partnership income in the amount of $314,416.00, states five explanations/bases with respect to substantive partnership items, and asserts alternative forms of penalties under Code § 6662. All of those assertions and explanations are disputed.

4.    The FPAA also allows $11,273.00 in certain reported partnership deductions. That allowance is not disputed.

### The Parties

5.    Jade Trading, LLC ("Jade Trading") is a limited liability company formed under the laws of the State of Delaware. It is treated as a partnership for federal income tax purposes. The taxpayer identification number of Jade Trading is 13-4079142, and its principal place of business is 9133 U.S. Highway 60, Sturgis, Kentucky 42459. Its United

---

1 At the time Robert and Laura filed their joint federal income tax returns for the taxable years ended December 31, 1999 and December 31, 2000, Laura used her maiden name of Kavanaugh. Because of this, the FPAA in this case was issued to "Robert W. Ervin and Laura Kavanaugh." Subsequent to the filing of their 2000 return, however, Laura changed her name to Laura Ervin. As a result, Laura is referred to as Laura Kavanaugh Ervin and Mrs. Ervin throughout this pleading.

States Partnership Return (Form 1065) for 1999 was filed with the Internal Revenue Service Center in Holtsville, New York.

6.    Ervin Capital, LLC ("Ervin Capital") is a member and a notice partner of Jade Trading.

7.    Ervin Capital has an interest in the outcome of this action because the partnership items of Ervin Capital have not become non-partnership items by reason of one or more of the events described in Code § 6231(c) and the period of limitations for assessment of partnership items against Ervin Capital has not expired.

8.    The tax matters partner is Sentinel Advisors, LLC.  Its address is 546 Fifth Avenue, New York, New York 10036.

9.    Such tax matters partner has not filed a complaint for readjustment of partnership items within the period specified in Code § 6226(a).

10.    Robert W. Ervin ("Robert") is an individual who is the sole member of Ervin Capital.  Robert is an indirect partner of Jade Trading, pursuant to Code § 6231(a)(10).  His address is P.O. Box 409, Sturgis, Kentucky 42459.  Laura Kavanaugh Ervin is married to and filed a joint return with Robert in 1999 and also is treated as an indirect partner of Jade Trading, pursuant to Code § 6231(a)(2).

11.    The Defendant is the United States of America with respect to the claims and actions by its agent, the IRS, an executive agency within the Department of Treasury. Service of process may be made on Defendant through the Attorney General at the Tax Division of the Department of Justice and upon such other offices or individuals as may be required.

## Jurisdiction

12.    This Court has jurisdiction over this claim, pursuant to 28 U.S.C. § 1508 and 26 U.S.C. § 6226(b).

## Deposit

13.    On September 11, 2003, Mr. and Mrs. Ervin deposited $4,110,812.00 with the IRS at 401 Frederica Street, Owensboro, Kentucky 42301. In accordance with Code § 6226(e), the deposit represents the amount by which Mr. and Mrs. Ervin's tax liability would be increased under the adjustments asserted in the FPAA issued by the Internal Revenue Service.[2]

## Assignments of Error

14.    The FPAA issued by the IRS erred in the following particulars:

    a.    In attempting to do indirectly what the IRS admits it cannot do directly;[3]

---

2 Pursuant to Code Section 6226(e), the amount of the deposit should be the amount by which the tax liability of a notice partner would be increased if the treatment of the *partnership items* on that partner's return were made consistent with the treatment of partnership items on the partnership return, as adjusted by the FPAA. The Jade Trading FPAA relates to 1999 and identifies the total partnership item adjustments as $314,416.00. Mr. Ervin's share of that adjustment would result in additional tax of approximately $26,901.00. By Plaintiff's reading of the statute, the amount required as a deposit is that amount. In informal discussions, however, the IRS has contended that the deposit amount should include the greatest amount of tax that would result from, not only adjustments inside the partnership, but also from adjustments to losses (which resulted from dispositions outside of the partnership, and as such are clearly not partnership items) on Mr. and Mrs. Ervin's individual returns for both 1999 and 2000. To accommodate the IRS' expansive reading of the Code and to avoid a dispute over jurisdiction, Mr. and Mrs. Ervin deposited an amount that is over $4 million more than a close reading of the statute requires.

3 The heart of the IRS objection is that neither Ervin Capital nor Jade reduced the partnership basis by the amount of a potential obligation to deliver Euro dollars ("Euros") in the future under a call option held by an unrelated third party. As recently as June 23, 2003, the IRS admitted that the Tax Court correctly held in *Helmer v. Commissioner*, T.C. Memo 1975-160 that such an option results in NO BASIS REDUCTION. *Cf.*, Temp. Reg. § 1.752-6T (IRS attempt to retroactively reverse *Helmer*). In short, the returns filed by Jade, Robert, and Laura treated that basis correctly.

b.    In seeking to substitute pejoratives and self-serving labels for the results permitted by law, simply because those results and that law do not favor the IRS in this particular case;

c.    In simultaneously honoring the existence of the partnership whenever it suits the IRS' financial interests and disregarding the existence of the partnership whenever its existence does not suit the IRS' financial interests;

d.    In asserting that, under Treas. Reg. §1.701-2, Jade was a sham and was formed or availed of in connection with a transaction or transactions, a principal purpose of which was to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code, and, as a consequence,  (i) the partnership should be disregarded and all transactions engaged in by the partnership should be treated as engaged in directly by the partners; and (ii) Euros and Xerox stock purportedly acquired by the partnership should be treated as having been acquired directly by purported partners Ervin Holdings, Ervin Capital, LLC, and Ervin Investments, LLC;

e.    In asserting that, under Treas. Reg. §1.701-2, Euro currency options contributed to or assumed by Jade Trading should be treated as never having been contributed or assumed and gains or losses

realized by the partnership on the options transactions should be treated as having been realized by the partners directly;

f.      In further asserting that, under Treas. Reg. §1.701-2,  the partners should not be treated as partners;

g.      In further asserting that, under Treas. Reg. §1.701-2, the contributions to the partnership "will be adjusted to reflect clearly" at some unspecified time and in some unspecified way the Commissioner's view of the partnership's or partners' income;

h.      In relying upon an invalid regulation for four of its five substantive partnership positions;

i.      In further asserting that, even if the Euro currency options were treated as contributed to Jade Trading, the bases of the options should be reduced, both in the hands of the contributing partners and the partnership, by any amount received by the partner from the contemporaneous sale of a substantially similar option to the same counter-party;

j.      In further asserting that the 40% penalty attributable to a gross valuation misstatement applies under Code §§ 6662(a), 6662(b)(1), 6662(c) and 6662(h);

k.      In asserting alternatively that the 20% penalty attributable to negligence or disregard of rules and regulations applies as provided by Code §§ 6662(a), 6662(b)(2), and 6662(c);

-6-

l.    In asserting alternatively that the 20% penalty attributable to a substantial understatement of income tax applies under Code §§ 6662(a), 6662(b)(2), and 6662(c) and that the 20% penalty for substantial understatement of income tax for tax shelter transactions applies; and

m.    In asserting alternatively that the 20% penalty for substantial valuation misstatement applies under Code §§ 6662(a), 6662(b)(2), and 6662(c).

### Facts

15.    The facts and mixed matters of fact and law on which Plaintiffs rely are as follows:

a.    The Ervin brothers are decent people who took great care to follow the law. The IRS does not like the result of that law in this case and now wants to ignore the same principles the IRS successfully urged and applied to its financial advantage in other cases. That effort, along with the IRS effort to override the role of the judiciary and Congress, defies the precedent of this Court and this Circuit.

b.    The IRS may consider the partnership a sham at times, but the Ervin brothers do not. As long as Robert can remember, he and his brothers Tim and Gary have been equal partners in one form or another.

c.    Robert grew up in western Kentucky, the youngest of the three brothers. He and his brothers, Tim and Gary, helped their father farm

and when they were able, Gary and Tim worked in the coal mines to augment the family income. By the time Robert, the fourth child, was old enough to work in the coal mines, Gary and Tim needed him to work with them on cable construction crews.

d.  Throughout their lives, they have followed the same path. All three were active in Future Farmers of America ("FFA") in western Kentucky. They all wrestled in high school and they all received wrestling scholarships to college. Gary won the State High School Wrestling Championship in his weight class and qualified for the Nationals in college. Tim followed his brother's footsteps by winning the State High School Wrestling Championship several years. Tim was also a three time All-American at Southern Illinois University. Robert, the youngest of the three brothers, won the High School State Wrestling Championship several years, was twice named the Kentucky Outstanding High School Wrestler of the Year, but lost his scholarship to Southern Illinois when he fractured his spine in a tournament and was unable to wrestle after his spine was fused. Gary coached wrestling in college for a year. In spite of his spinal problems, Robert and his brother Tim still coach in the local high school.

e.  The first partnership between the brothers began when Gary was in sixth grade and Tim was in fourth grade. Their father gave them two

pigs to raise. As partners, Gary and Tim fattened them for a year, sold them, and shared the proceeds.

f.    When they later started wrestling and needed money to attend summer wrestling camps at the University of Iowa and Granby in Virginia, these two brothers salvaged bricks together, together paid their cousin (who was old enough to drive) to haul the bricks, together paid for the damage to the truck, and, as partners, used the net partnership proceeds to pay the cost of the camps for both of them.

g.    As young men, they were awarded the first Federal Communications Commission ("FCC") cable license for Union County, Kentucky, which propelled them into the cable construction business.

h.    Since that time, Robert, Tim, and Gary have been equal partners in over 50 ventures of different sorts. They included various cable companies early on and, in more recent years, real estate, hedge funds, equities, foreign currencies, and several small businesses. In fairness, their counsel have advised them to structure the ventures either as general partnerships, limited partnerships, limited liability companies, S corporations, C corporations, or personal ownership depending upon the tax and other legal consequences. As an example of the consequences normally considered, a C corporation may offer certain otherwise unavailable deductions for retirement contributions, an S corporation may avoid the double taxation associated with a C corporation, a partnership may offer the

-9-

recognition of basis not otherwise available through an S corporation, and a limited liability company may offer a combination of corporate and partnership benefits.

i.  While they faithfully follow the advice of their professionals as to structure, the brothers generally participate equally in business, charitable, and other endeavors.

j.  Robert, Tim and Gary sold their three primary businesses in 1999 to two publicly-traded companies.

k.  In a rare occurrence, Gary and his brother Tim argued about selling the cable businesses.  Tim wanted them to stay in the cable business (about which they had a great deal of knowledge), but Gary thought the offers were too important to their families to let them go.  Gary was concerned about the future of high-tech industries like cable. The three brothers ultimately agreed to sell.  Gary thought that they could get a better price if they took some stock but Tim wanted cash. As with all things financial, Tim and Robert ultimately followed their older brother's lead.  Through a reverse triangular merger structured by their lawyers, they received more cash and stock than they ever imagined.

l.  They needed to reinvest their funds.  Moreover, Gary agreed with Tim that they badly needed to somehow diversify their dependence upon the Dycom Industries, Inc. stock that they received from the reverse triangular merger of their business.

-10-

m.    As soon as word of the sales leaked out, scores of sophisticated people from big cities started contacting Gary with investment ideas and strategies to help the brothers diversify.  As always, Tim and Robert deferred to Gary on this strategic financial matter.  Under the direction of Gary, Tim and Robert had reaped substantial financial rewards during the previous two decades.  That being the case, Tim and Robert saw no reason to change this successful formula. Through years in the technology-sensitive cable business, Gary regularly relied upon knowledgeable people with expertise in areas that were new to him, but the level of contacts needed to be narrowed.

n.    Gary narrowed such contacts by making inquiries into their backgrounds and references.

o.    On behalf of his brothers, Gary was open to sophisticated ideas  - including various forms of derivative trading such as options, collars, and forward contracts.

p.    After much thought, Gary recommended to Tim and Robert that they diversify their investments through accounts at different houses.

q.    One of those investment houses handled a series of derivatives (collars and forward contracts) on a significant portion of their Dycom stock in order to protect the brothers against a sudden downturn in Dycom's stock price.  Gary, Tim and Robert trusted the people at that investment house to properly structure the derivatives.

-11-

r.      Several other houses diversified their investments for them through hedge funds, some of which traded in both straight foreign currencies and foreign currency-based derivatives.

s.      One of those hedge funds was through a firm in New York by the name of Sentinel Advisors, LLC ("Sentinel").

t.      On behalf of Tim, Robert and himself, Gary checked into the backgrounds of those involved.

u.      The principals at Sentinel had extensive foreign currency trading experience with the major New York banks such as Bankers Trust.

v.      Like many investment professionals who were closely monitoring the foreign exchange markets during the summer and autumn of 1999, Sentinel was bullish on the Euro.

w.      After its launch on January 1, 1999, when many economists and currency specialists were quoted in the general business press as saying the Euro was overvalued, the single-European currency receded substantially relative to the U.S. Dollar throughout the first half of 1999. Around this time, a marked shift in sentiment began to take hold. The weakened Euro had a positive affect on many Eurozone economies, not the least of which was Germany, Europe's largest economic power.

x.      Due to the weakened Euro, German manufacturers were enjoying a significant rise in exports, as wholesalers and retailers in America sought to take advantage of lower prices across the Atlantic. When

-12-

the Euro continued to slide in the foreign exchange market, the general business press began reporting that, in light of the improving overall economic conditions in the Eurozone, many foreign currency analysts and traders on Wall Street believed the Euro was primed for a positive move against the U.S. dollar.

y.     The professionals at Sentinel were among those who viewed the Euro as a compelling buying opportunity. While taking a long position in the Euro was somewhat speculative in the sense that it was a new currency and had little trading history, the currency specialists at Sentinel were extremely bullish on the prospects of a sharp rise in the Euro relative to the U.S. dollar. They presented Gary, who was performing due diligence on behalf of Tim, Robert and himself, with historical information based on options trading in Swiss francs, the currency most-closely pegged to the Euro prior to its launch. The Swiss franc parallel indicated that knock-out options over the prior year would pay out roughly one out of five times and, among the profitable trades, the average return was 14:1.

z.     The Sentinel principals also told Gary, who was performing due diligence on behalf of Tim, Robert and himself, based on both technical and fundamental analysis, that they expected the Euro to outperform the Swiss franc. Specifically, Gary, and by extension Tim and Robert, were told they could reap returns on the Euro-based knock-out derivative investments of over 30:1.

-13-

aa.    The Euro-based knock-out options were not the only way Gary was told he and his brothers could profit.  The trading with Sentinel presented at least three separate sets of opportunities for Gary, Tim and Robert to make a great deal of money if Sentinel's bullish bet on the Euro was right:

   (i)    Gary, Tim and Robert could at least double their money on certain conventional Euro options;

   (ii)   Gary, Tim and Robert could reap the noted return on the Euro knock-out options of over 30:1; and

   (iii)  The brothers could also profit from the hedge fund trading in individual foreign currencies, more vanilla foreign currency options and equities.

ab.    Gary, who was performing due diligence on behalf of Tim, Robert and himself, was told that, as a practical matter, the hedge fund trading needed to be handled through a partnership.

ac.    From previous hedge fund activity, Gary, who was performing due diligence on behalf of Tim, Robert and himself, knew that hedge funds were normally conducted through a partnership for a host of reasons.

ad.    The structure of the partnership contained a number of features that made a great deal of sense to Gary, who was performing due diligence on behalf of Tim, Robert and himself.

ae.    Of particular note, Gary, who was performing due diligence on behalf of Tim, Robert and himself, also particularly liked the fact that Sentinel

-14-

itself was a member of the LLC/partnership and would serve as the managing member, so that those who were most knowledgeable about the trading would participate in the success.

af.    For the same reason, Gary, who was performing due diligence on behalf of Tim, Robert and himself, liked the fact that Sentinel was motivated by the promise of a very handsome success bonus. As the Managing Member of Jade, Sentinel was entitled to 20% of the Net Capital Appreciation enjoyed by the fund. In Gary's estimation, this "Incentive Allocation" arrangement provided Sentinel with added motivation to place Jade into profitable investments. After all, for every dollar of profit earned by Jade, Sentinel would take home 20 cents. From a management perspective, Gary, Tim and Robert always believed that giving employees a stake in the fortunes of a company, be it in the form of equity or profit sharing, was simply good business. Gary viewed Sentinel's "Incentive Allocation" arrangement no differently.

ag.    Gary, who was performing due diligence on behalf of Tim, Robert and himself, was also told that, even if the Euro dropped, the tax laws provided some downside protection. He was told by competent tax advisors that the tax laws recognized that citizens may so arrange their affairs so as to minimize their taxes and do not have any duty (patriotic or otherwise) to pay a penny more in taxes than is otherwise due.

-15-

ah.  From their experience through the years in the cable business and most recently in the reverse triangular merger, Gary, Tim and Robert knew that they needed to rely upon capable people to handle the intricacies of the tax laws and that business transactions could and should be structured with tax consequences in mind.

ai.  Consistent with the effort to maximize profits, Gary, who was acting on behalf of Tim, Robert and himself, negotiated reductions in various costs, including the consulting fees with New Vista, an affiliate of Sentinel.

aj.  For liability purposes, Robert established a single member limited liability company, Ervin Capital, LLC.  Gary and Tim also established single member LLC's, namely Ervin Holdings, LLC, and Ervin Investments, LLC.

ak.  On September 29, 1999, Ervin Capital bought a European-style Euro/U.S. Dollar ("EUR/USD") call option for a premium amount of $15,000,020.00 from AIG International ("purchased call option"). AIG International (now AIG Trading Group, Inc.) is a first tier market maker for spot trades, forwards and options in both developed and emerging market currencies.  It is a wholly owned subsidiary of the worldwide insurance conglomerate AIG and was at all times an unrelated third-party with respect to Robert, his brothers, their activities, and Sentinel.

-16-

al.    Under the purchased call option, which had a strike price of 1.084000, Ervin Capital held the right to purchase EUR 290,540,000.00 in exchange for US $314,945,360.00 on the expiration date.

am.    Also on September 29, 1999, Ervin Capital sold a European-style, EUR/USD call option for a premium amount of $14,850,018.00 to AIG International ("sold call option").  The sold call option, which had a strike price of 1.085000, provided AIG International with the right to purchase EUR 290,540,000.00 for US $315,235,900.00.

an.    The sold call option was a contingent obligation under which Ervin Capital would not be liable unless and until AIG exercised the option.

ao.    Neither Ervin Capital nor Jade Trading (to whom the option was later transferred) was ever called upon to fulfill this contingent obligation.

ap.    On October 6, 1999, Ervin Capital contributed its purchased call option and its sold call option to Jade Trading, a limited liability company treated as a partnership for federal income tax purposes.

aq.    In exchange for contributing its purchased call option, sold call option and $75,000.00, Ervin Capital received a 30.7 percent interest in Jade Trading.

ar.    Shortly after its inception, Jade Trading began taking long positions in the Euro.  To the surprise of the investment professionals at Sentinel, and others in the investment community as well, the Euro continued declining against the dollar, rather than advancing.  Currency traders and analysts started expressing concern that the Euro was

-17-

approaching a cross-over of the all-important threshold of parity with the dollar. The fear was that if the Euro fell below parity, it would lead to a massive wave of sell-offs as investors gave up on the notion of a single-European currency ever challenging the dollar as the business world's preeminent currency.

as.     That concern was heightened by the growing anxiety over Y2K — anxiety that ultimately left the foreign exchange markets at a near stand-still during the last several weeks of 1999. To the dismay of Euro bulls, the fear of an inverted position became a reality, as the Euro slipped below parity with the dollar for the first time on December 3, 1999.

at.     By the December 3, 1999 parity cross-over, Ervin Capital, Ervin Holdings, and Ervin Investments concluded that the bullish predictions were excessively optimistic. Within days of the parity cross-over, they notified the fund manager of their wish to withdraw from the partnership. As a result, the partnership distributed a portion of its foreign currency and Xerox stock to Ervin Capital, Ervin Holdings, and Ervin Investments in termination of their partnership interests.

au.     During 1999, Jade Trading incurred net losses and deductions of $292,015.00. Of that amount, $104,158.00 was allocated to Ervin Capital.

av.     As admitted by the IRS in the FPAA, Jade Trading reaped partnership income during 1999. Specifically, the IRS increased the partnership's

-18-

gross income by $314,416.00 and determined that Jade's net income was $22,401.00.

aw.   As also admitted by the IRS in the FPAA, the partnership properly reported certain partnership deductions in the amount of $11,273.00.

ax.   The partnership continued trading into 2000 at a reduced scale on behalf of its remaining partners.

ay.   The partnership was bona fide. Further, each partnership transaction or series of related transactions were entered into for a substantial business purpose.

az.   Jade Trading was formed to permit its partners to conduct business jointly, including investment activities through a flexible economic arrangement without incurring an entity-level tax.

ba.   At all relevant times, Jade Trading has been a legally recognized entity under Delaware law.

bb.   Following its formation in 1999 and continuing into 2000, Jade Trading engaged in business activity in its name and on its own behalf as a limited liability company.

bc.   Investing through a partnership such as Jade Trading certainly served the important business purposes that normally cause people to form limited liability companies and partnerships (e.g., increasing returns through centralized control and investment decisions, leverage, collateral, administrative efficiency, consolidated cost reduction), but here it was also essential considering that Jade's trading philosophy

-19-

was consistent with that of a hedge fund. As a matter of industry practice, hedge funds are organized as partnerships or limited liability companies.

bd. Contrary to the assertion in the FPAA, the tax consequences to each partner of partnership operations and of transactions between the partner and the partnership accurately reflected such partner's economic arrangement and clearly reflected such partner's income (individually and collectively) under the law.

be. The partnership was formed for the express purpose of making money from trading. Neither Robert nor his brothers would have participated but for the opportunity to make money and diversify their investment position through trading. The partnership was not formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K.

bf. During 1999, Jade (i) entered into enforceable binding option contracts in its own name as a party; (ii) maintained trading accounts in its own name at Salomon Smith Barney; (iii) acquired foreign currency positions in its own name; (iv) bought foreign currency positions in its own name; (v) sold foreign currency positions in its own name; (vi) acquired equities in its own name; and (vii) conducted business as a functioning, existing limited liability company.

bg.  Jade Trading made all filings required by law. It had a separate bank account in its name. It traded and otherwise did business with unrelated parties in its name. In all respects, it conducted itself as a business entity, distinct from its partners.

bh.  The Ervin Capital purchased call option and sold call option were separate and distinct properties for several reasons. For example, under the contractual terms of each trade confirmation, (i) each constituted separate property in the form of contract rights under state law, (ii) each contract was separately enforceable under state law, (iii) one contract could have been embraced and the other disavowed under debtor/creditor rights, (iv) each purchased and sold call option was independently transferable and assignable, (v) each purchased and sold call option had a different strike price, and (vii) each purchased and sold call option had a different notional amount. In addition, since each purchased call option and sold call option constituted a § 988 transaction, they cannot be integrated for income tax purposes.

bi.  In the Spring of 2000, Robert (through Ervin Capital, LLC) received a Form K-1 from Jade Trading reporting the results of his trading with the partnership, as well as distributions of currency and stock. The Jade Trading partnership return and Forms K-1 were prepared by a qualified CPA with knowledge of the facts. Jade Trading and its

-21-

partners relied on the expertise of the partnership return preparer and other advisors in preparing their returns.

bj.    Jade Trading and its partners also engaged well qualified advisors to evaluate the financial merits of the investment and the proper tax treatment of the transactions in issue.

bk.    Jade Trading and its partners did not attempt to limit the scope of the advisors' research or investigation.  The partners secured tax opinions from their respected tax advisors, who informed them that the tax treatment of the losses from and transactions with Jade Trading, as reported on the respective returns, were more likely than not correct.

bl.    In its temporary regulation (§ 1.752-6T) dated June 23, 2003, the IRS admitted that Jade and its partners were correct with respect to the central point the IRS now labels as an abuse – the rule of law the IRS itself established in *Helmer v. Commissioner*, T.C. Memo 1975-160, 34 T.C.M. 727 (1975) (contingent obligations to deliver property under an option do not constitute liabilities that affect basis under Code § 752).

bm.    Jade Trading filed its 1999 return in good faith with due and reasonable regard for the income tax rules and regulations, and in reliance on qualified tax professionals who were in possession of all pertinent facts when the return was filed and whom Jade and its partners believed when the experts opined that the position taken was more likely than not the correct position.  The actions undertaken by

-22-

Jade Trading and its partners meet and exceed the ordinary care protected by Code §§ 6662 and 6664 in complying with the income tax rules and regulations. Neither Jade Trading nor its partners were negligent; nor did either act with intentional disregard of the rules or regulations under Code §6662.

bn.    Neither the value nor the adjusted basis of any property claimed on Jade Trading's 1999 federal income tax return was 400% or more of the correct amount, nor was a price paid for any property or services (or for the use of property) claimed on the return in connection with any transaction between persons described in Code § 482, 400 % or more (or 25% or less) of the amount determined under Code § 482 to be the correct amount of such price. All transactions reflected on the returns were reported at amounts based on trading transactions with unrelated parties. No amounts on the returns were determined by valuation. Thus, the 40% valuation misstatement penalty is not applicable to Jade Trading or its partners.

bo.    Neither the value nor the adjusted basis of any property claimed on Jade Trading's 1999 federal income tax return was 200% or more of the correct amount, nor was a price paid for any property or services (or for the use of property) claimed on the return in connection with any transaction between persons described in Code § 482, 200% or more (or 50% or less) of the amount determined under Code § 482 to

be the correct amount of such price. Thus, the 20% valuation misstatement penalty is not applicable to Jade Trading or its partners.

bp.    Jade Trading had no substantial understatement of its income tax. Moreover, Jade Trading and any transactions at issue are not tax shelters as defined by Code. Code § 6662(d)(2)(C) or (D). Even if a substantial understatement of income tax were ultimately determined to be due, there was substantial authority for the treatment of all items on the 1999 return of Jade Trading and each partner had a reasonable basis for believing that the tax treatment of such item was more likely than not the proper treatment. Furthermore, all items were disclosed on the appropriate return and there was a reasonable basis for the tax treatment of each item.

bq.    In all events, no penalty can or should be applied against Jade, as an entity or against its partners since all concerned proceeded in good faith based upon reasonable cause within the meaning of Code § 6664(c).

16.    Accuracy related penalties under Code § 6662 apply only to an underpayment of tax required to be shown on a return. No tax was required to be shown on the partnership return for Jade Trading. Accordingly, no penalties are determinable in this proceeding. Even if an underpayment were determined to be due, there was reasonable cause for such underpayment and Jade Trading, through its partners, acted in good faith in reliance on their qualified tax advisors. Hence, no penalty is due with respect to such underpayment pursuant to Code § 6664(c). Furthermore, the FPAA is deficient

with respect to the asserted penalties for failure to describe any factual basis for asserting them.

17.     Defendant bears the burden of proof as to the penalties, as well as the substantive partnership items.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

(i)     for a redetermination of the FPAA to remove all adjustments to income, losses, distributions, basis, and penalties;

(ii)    for recovery of the $4,110,812.00 in taxes deposited (plus any interest permitted by law); and

(iii)   for such further relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

September 11, 2003
Date

DAVID D. AUGHTRY
Georgia Bar No. 028010
Chamberlain, Hrdlicka, White,
    Williams & Martin
191 Peachtree Street, N.E., Ninth Floor
Atlanta, Georgia  30303
Telephone:  (404) 659-1410
Facsimile:  (404) 659-1852

-25-

9-11-03
_____
Date

Linda S. Paine  88 with expressed
permission
LINDA S. PAINE
Texas Bar No: 15414000
Chamberlain, Hrdlicka, White,
  Williams & Martin
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 658-1818
Facsimile: (713) 658-2550

148544.1
002871-000000:9/10/03

Internal Revenue Service
Director, Field Compliance Area 6
Small Business/Self-Employed

Department of the Treasury
477 Michigan Avenue   Stop #16
Detroit, MI 48226

Date: April 15, 2003

Refer To:
   S:C:CS:CM:TT:E:6:E14
Taxpayer Identifying Number:
   ███████

Name of Partnership:
   Jade Trading, LLC
   13-4079142

> Robert Ervin and Laura Kavanaugh
  P.O. Box 409
  Sturgis, KY 42459

Tax Year Ended:
   December 31, 1999
Person To Contact:
   Marie J. Nichols
Employee Identification Number:
   38-00214
Contact Telephone Number:
   (313) 628-3450
CERTIFIED MAIL #7002 2410 0005 7909 4435

Dear Robert Ervin and Laura Kavanaugh:

## NOTICE OF FINAL PARTNERSHIP ADMINISTRATIVE ADJUSTMENT

As required by law, we are sending this Notice of Final Partnership Administrative Adjustment (FPAA) to the partnership shown above and to each partner of the partnership who is entitled to such notice.

We are proposing adjustments to the partnership items of the partnership. We are sending this information to the Tax Matters Person (TMP) of the partnership, who is the partner designated by the partnership to deal with the IRS. He/she is also authorized to act for the partners who are not entitled to receive this notice. Any partner who wants a copy of the examination report should request it from the TMP. If the TMP is unable to provide you with a copy of the examination report, please contact the person named at the top of this letter.

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease in the tax liability on your individual return. The Form 870-P, Agreement to Assessment and Collection of Deficiency in Tax for Partnership Adjustments, is a summary of the proposed adjustments to the partnership return. You may compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

You have three options available to you.

## 1. If you agree with the adjustments:

Sign the enclosed Form 870-PT. By doing so, you are agreeing to pay any additional tax and interest resulting from the adjustments to the partnership return. You are also waiving your rights to participate in any administrative or judicial proceeding affecting the partnership years in question. This agreement will not become effective or final until you return it and it is signed in behalf of the

Letter 1830(DO) (Rev. 10-93)

**EXHIBIT**

tabbies

A

_____

1

Commissioner of Internal Revenue. Once the agreement is final, you may not file a claim to change the items in question or file a claim for refund or credit based on a readjustment.

## 2. If you don't agree with the adjustments:

If you are the TMP of the partnership and want to contest the adjustments in court, you have 90 days from the date this letter was mailed to file a petition for a readjustment of the partnership items of the partnership with:

1. The United States Tax Court;
2. The United States Court of Federal Claims; or
3. The District Court of the United States for the district in which the partnership's principal place of business is located.

During this 90-day period, no other partner may file a petition for judicial review, and the filing of a petition by the TMP precludes all other actions.

If the TMP doesn't file a petition by the 90th day from the date the FPAA was mailed, any other partner entitled to receive this notice {or any group of partners who together have an interest of five percent or more in the profits of the partnership (5 percent group)} may petition one of these courts after the 90th day, but on or before the 150th day, from the date the FPAA was mailed to the TMP. If more than one petition is filed, the first petition filed in the Tax Court will go forward. All other petitions (even those filed earlier in one of the other courts) will be dismissed. If no petition is filed in the Tax Court, the first petition filed in one of the other courts will go forward and subsequent petitions will be dismissed.

Petitions filed with the United States Tax court must be mailed to:

> United States Tax Court
> 400 Second Street, NW
> Washington, DC 20217

Attach a copy of this letter to the petition. The time in which you must file a petition with the court is fixed by law and the court cannot consider your case if your petition is filed late. If this letter is addressed to both a husband and wife, and both want to petition the Tax Court, both must sign the petition or each must file a separate, signed petition.

As a condition to filing a petition in either the appropriate District Court or the Court of Federal Claims, the partner filing the petition (including each member of a 5 percent group that files a petition) must deposit the amount by which the partner's tax liability would be increased if the treatment of the partnership items of the partnership on the partner's return were made consistent with the treatment of the partnership items under the FPAA. If you reported the partnership items of the partnership the way the partnership reported them on its return, you can generally determine the amount to deposit by taking your pro rata share of the partnership adjustments into account in recomputing your tax. You must deposit this amount with IRS on or before the day you file your petition.

## 3. If you do nothing:

If no readjustment petition is filed in any of the courts listed in this letter, the FPAA becomes binding, and we will bill you for any additional tax plus interest that you may owe under the FPAA. You won't be permitted to contest the treatment of the partnership items of the partnership under the FPAA in any refund claim or suit. The law permits us to bill you after 150 days from the mailing date

Letter 1830(DO) (Rev. 10-93)

of the FPAA to the TMP.  However, if a petition is filed in the Tax Court, we won't bill you until the Tax Court decision is final.

You may wish to contact the TMP of the partnership or your tax advisor to discuss this matter.

If you have any questions, please write to the person whose name and address are shown in the heading of this letter.  If you write, attach a copy of this letter to help identify your account.  Also include your telephone number and the most convenient time for us to call you in case we need additional information.

If you prefer, you may call the IRS contact person at the telephone number shown in the heading of this letter.  If this number is outside your local calling area, there will be a long distance charge to you.

Thank you for your cooperation.

Sincerely,

*Jeffrey J. Basalla (by mn)*
Jeffrey J. Basalla
Director, Field Compliance Area 6
Small Business/Self-Employed

Enclosures:
  Form 870-PT
  Copy of this letter

Letter 1830(DO) (Rev. 10-93)

| Form **870-PT**<br>(08-2001) | DEPARTMENT OF THE TREASURY — INTERNAL REVENUE SERVICE<br>**Agreement for Partnership Items and Partnership<br>Level Determinations as to Penalties, Additions to<br>Tax, and Additional Amounts** | IN REPLY<br>REFER TO:<br>S:C:CS:CM:TT:E:6:E14 |
|---|---|---|

| Taxpayer name(s), address and ZIP code:<br>**Robert Ervin and Laura Kavanaugh**<br>**P.O. Box 409**<br>**Sturgis, KY 42459** | Name of Partnership:<br>**Jade Trading, LLC**<br><br>Taxpayer Identifying Number:<br>**13-4079142** | Tax Year(s) Ended:<br><br>**December 31, 1999** |
|---|---|---|
| | Name of Tax Matters Partner:<br>**Sentinel Advisors, LLC, TMP** | |
| Taxpayer Identifying Number: ███████ | | |

## Offer of Agreement to Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts
## &
## Waiver of Restrictions on Assessment for Partnership Items, Penalties, Additions to Tax, and Additional Amounts

Under sections 6224(c) and 7121 of the Internal Revenue Code of 1986, the Commissioner of the Internal Revenue Service and the undersigned taxpayer(s) agree to the determination of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items as shown on the attached schedule of adjustments.

The undersigned taxpayer(s), in accordance with sections 6224(b) and 6213(d), also waives the restrictions provided by sections 6225(a) and 6213(a) and consents to the assessment and collection of any deficiency attributable to adjustments to partnership items, penalties, additions to tax and additional amounts that relate to adjustments to partnership items, as set forth in the attached schedule of adjustments; plus any interest provided by law.

This agreement is conditional and will not become effective or final until this agreement form is returned to the Commissioner and is signed on his or her behalf. The one-year extension of the period of limitations on assessments under section 6229(f) will not begin to run until the date the Commissioner's representative signs this form on the Commissioner's behalf.

If this part of this agreement form is signed for the Commissioner, the treatment of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items under this agreement will not be reopened in absence of fraud, malfeasance, or misrepresentation of fact. In addition, no claim for an adjustment of partnership items, refund or credit based on any change in the treatment of partnership items or partnership level determinations as to penalties, additions to tax and additional amounts may be filed or prosecuted.

| Signature of Taxpayer | | Date Signed |
|---|---|---|
| Signature of Taxpayer | | Date Signed |
| By (Signature and Title) | | Date Signed |

| FOR<br>INTERNAL<br>REVENUE<br>USE ONLY | Date accepted for Commissioner | Signature |
|---|---|---|
| | Office | Title |

| Cat. No. 57315A | www.irs.gov | (See Instructions for Signing Agreement) | Form **870-PT** (Rev. 8-2001) |
|---|---|---|---|

## INSTRUCTIONS FOR SIGNING THIS AGREEMENT

1.  If a JOINT RETURN OF A HUSBAND AND WIFE was filed and both spouses intend to agree, both spouses must sign Form 870-PT. One spouse may sign as agent for the other, if acting under a power of attorney.

2.  If the taxpayer is a corporation, the agreement must be signed with the corporate name followed by the signature and title of the officer authorized to sign Form 870-PT.

3.  Your attorney or agent may sign for you if this action is specifically authorized by a power of attorney, which if not previously filed, must accompany this form.

4.  If this offer is signed by a Tax Matters Partner, please include the title with the signature.

Department of the Treasury - Internal Revenue Service
## Agreement to Assessment and Collection of
## Deficiency in Tax for Partnership Adjustments

### Schedule of Adjustments

| Name of Partnership:<br><br>JADE TRADING LLC  % SENTINEL ADVISO<br><br>Taxpayer Identification Number:  13-4079142 | Tax Year(s) Ended: | | |
|---|---|---|---|
| | 12/31/1999 | | |
| **Detail of Adjustments to Ordinary Income:** | | | |
| a. Other deductions | | | |
| b. | | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| **Total Adjustments to Ordinary Income** | | | |
| **Other Adjustments** | ************************ | ************************ | ************************ |
| a. Other income (loss) | ************************ | ************************ | ************************ |
| (1) Adjustment | 314,416.00 | | |
| (2) As reported | (292,015.00) | | |
| (3) Corrected | 22,401.00 | | |
| b. Other deductions | ************************ | ************************ | ************************ |
| (1) Adjustment | 0.00 | | |
| (2) As reported | 11,273.00 | | |
| (3) Corrected | 11,273.00 | | |

Remarks:

See attachment for "Explanation of Adjustments -- Jade Trading, LLC."

See attachment for "Information Regarding Additions to Tax (Penalties) and Affected Items."

RGS Ver. 3.20.00

Form 870-P

6

| Name: | JADE TRADING LLC  % SENTINEL ADVISORS LLC | | Page | of |
| TIN: | 13-4079142 | | | 199912 |

## Form 870-P – Other Adjustments (Continued)

| | Year:   12/31/1999 | Year: | Year: |
|---|---|---|---|
| c.  Distributions - property other than money | *********************** | *********************** | *********************** |
| (1) Adjustment | (398,279.00) | | |
| (2) As reported | 398,279.00 | | |
| (3) Corrected | 0.00 | | |
| (1) Adjustment | *********************** | *********************** | *********************** |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | *********************** | *********************** | *********************** |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | *********************** | *********************** | *********************** |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | *********************** | *********************** | *********************** |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | *********************** | *********************** | *********************** |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | *********************** | *********************** | *********************** |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | *********************** | *********************** | *********************** |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | *********************** | *********************** | *********************** |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | *********************** | *********************** | *********************** |
| (2) As reported | | | |
| Corrected | | | |

RGS Ver. 3.20.00

Form 870-P (continued)

## Explanation of Adjustments – Jade Trading, LLC

1.    It is determined that Jade Trading, LLC, is a sham and, under §1.701-2, was formed or availed of in connection with a transaction or transactions in taxable year 1999, a principal purpose of which was to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code. It is consequently determined that the partnership is disregarded and that all transactions engaged by Jade Trading, LLC, are treated as engaged in directly by the purported partners. This includes the determination that the Euros and Xerox stock purportedly acquired by the partnership were acquired directly by purported partners Ervin Holdings, LLC, Ervin Capital, LLC, and Ervin Investments, LLC.

2.    It is determined that, under §1.701-2 of the Treasury Regulations, Euro currency options, purportedly contributed to or assumed by the partnership, are treated as never having been contributed to or assumed by the partnership and any gains or losses purportedly realized by the partnership on the options are treated as having been realized by the purported partners Ervin Holdings, LLC, Ervin Capital, LLC, and Ervin Investments, LLC.

3.    It is further determined that, under §1.701-2 of the Treasury Regulations, Ervin Holdings, LLC, Ervin Capital, LLC, and Ervin Investments, LLC, should be treated as not being partners in the partnership.

4.    It is further determined that, under §1.701-2 of the Treasury Regulations, contributions to the partnership will be adjusted to reflect clearly the partnership's or partners' income.

5.    Even if Euro currency options were to be treated as contributed to the partnership, the bases of the options are reduced, both in the hands of the contributing partners and the partnership, by any amount received by the contributing partner from the contemporaneous sale of a substantially similar option to the same counter-party. Thus, any amount treated as an increase in outside basis from the contribution of Euro currency options is disallowed.

6.    Accuracy-Related Penalties

It is determined that the underpayment of tax for the taxable year 1999 is due to a gross valuation misstatement of the adjusted basis in the partners' basis in their partnership interest and the consequent basis in the Euros and Xerox stock distributed to partners to which their partnership basis attached. Therefore, the 40 percent penalty is imposed on the underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(3), 6662(e) and 6662(h) of the Internal Revenue Code.

Alternatively, it is determined that all or part of the underpayment of tax for the taxable year 1999 is due to negligence or disregard of rules and regulations for filing income tax returns. Consequently, the 20 percent penalty is imposed on the underpayment attributable to negligence or disregard of rules and regulations as provided by Sections 6662(a), 6662(b)(1), 6662(c) of the Internal Revenue Code.

Alternatively, it is determined that the underpayment of tax for the taxable year 1999 is due to an underpayment attributable to substantial understatement of income tax. Consequently, the 20 percent penalty is imposed on the underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(2), 6662(c) of the Internal Revenue Code.

Alternatively, it is determined that the underpayment of tax for the taxable year 1999 is a substantial understatement of income tax because the transaction is a tax shelter, no substantial authority has been established for the position taken, and there was no reasonable belief upon the filing of the return that the position taken was more likely than not the correct treatment of the transaction. Consequently, the 20 percent penalty is imposed on the underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(2), 6662(c) of the Internal Revenue Code.

## Information Regarding Additions to Tax (Penalties) and Affected Items

The Internal Revenue Code provides, in appropriate cases, for the application of accuracy related penalties under section 6662, which include, in part, penalties for negligence or disregard of rules or regulations, substantial understatement of income tax, and substantial valuation misstatements.

Under Internal Revenue Code section 6230(a)(2), for taxable years ending before August 6, 1997, penalties require a partner level determination and are separately determined and assessed after the outcome of the partnership proceeding. Upon the completion of the partnership proceeding or the execution of a Form 870-P, you may be sent an examination report and/or a statutory notice of deficiency asserting partner level penalties.

For partnership taxable years ending before August 6, 1997, a court will not have jurisdiction to consider such partner level penalties raised in a petition with respect to a notice of Final Partnership Administrative Adjustment (FPAA) pursuant to Internal Revenue Code section 6226(f). Thus, you should not raise any penalty should you decide to petition an FPAA to the Tax Court, Claims Court or a district court for a partnership taxable year ending before August 6, 1997.

For partnership taxable years ending after August 5, 1997, penalties are determined at the partnership level and may be agreed to as part of the partnership proceeding. A court will have jurisdiction over partnership level penalties raised in an FPAA petition for a partnership taxable year ending after August 5, 1997. Any partner level defense to partnership level penalty determinations, however, may only be raised through refund claims following the assessment and collection of such penalties.

For all partnership taxable years, other items affected by partnership adjustments, "affected items," may also be separately determined and assessed after the outcome of the partnership proceeding. Upon the completion of the partnership proceeding or the execution of a Form 870-PT (Form 870-P for tax years ending before August 6, 1997), you may be sent an examination report and/or a statutory notice of deficiency asserting affected items.

**Please note:** This is an information item only, and is not part of the notice of Final Partnership Administrative Adjustment.

10

Internal Revenue Service
Director, Field Compliance Area 6
Small Business/Self-Employed

Department of the Treasury
477 Michigan Avenue     Stop #16
Detroit, MI  48226


Date: APR 1 5 2003

Refer To:
    S:C:CS:CM:TT:E:6:E14
Taxpayer Identifying Number:
    ████████ of Partnership:
    Jade Trading, LLC
    13-4079142

>  Ervin Capital, LLC
    Attention:  Robert Wayne Ervin
    450 Pryor Boulevard, P.O. Box 409
    Sturgis, KY  42459

Tax Year Ended:
    December 31, 1999
Person To Contact:
    Marie J. Nichols
Employee Identification Number:
    38-00214
Contact Telephone Number:
    (313) 628-3450
CERTIFIED MAIL #7002 2410 0005 7909 4329

Dear Robert Wayne Ervin of Ervin Capital, LLC:

## NOTICE OF FINAL PARTNERSHIP ADMINISTRATIVE ADJUSTMENT

As required by law, we are sending this Notice of Final Partnership Administrative Adjustment (FPAA) to the partnership shown above and to each partner of the partnership who is entitled to such notice.

We are proposing adjustments to the partnership items of the partnership.  We are sending this information to the Tax Matters Person (TMP) of the partnership, who is the partner designated by the partnership to deal with the IRS.  He/she is also authorized to act for the partners who are not entitled to receive this notice.  Any partner who wants a copy of the examination report should request it from the TMP.  If the TMP is unable to provide you with a copy of the examination report, please contact the person named at the top of this letter.

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease in the tax liability on your individual return.  The Form 870-P, Agreement to Assessment and Collection of Deficiency in Tax for Partnership Adjustments, is a summary of the proposed adjustments to the partnership return.  You may compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

You have three options available to you.

## 1. If you agree with the adjustments:

Sign the enclosed Form 870-PT.  By doing so, you are agreeing to pay any additional tax and interest resulting from the adjustments to the partnership return.  You are also waiving your rights to participate in any administrative or judicial proceeding affecting the partnership years in question. This agreement will not become effective or final until you return it and it is signed in behalf of the

Letter 1830(DO) (Rev. 10-93)

```
┌─────────────────────┐
│      EXHIBIT        │
│                     │
│  tabbies    B       │
│          _____  │
└─────────────────────┘
```

Commissioner of Internal Revenue. Once the agreement is final, you may not file a claim to change the items in question or file a claim for refund or credit based on a readjustment.

## 2. If you don't agree with the adjustments:

If you are the TMP of the partnership and want to contest the adjustments in court, you have 90 days from the date this letter was mailed to file a petition for a readjustment of the partnership items of the partnership with:

1. The United States Tax Court;
2. The United States Court of Federal Claims; or
3. The District Court of the United States for the district in which the partnership's principal place of business is located.

During this 90-day period, no other partner may file a petition for judicial review, and the filing of a petition by the TMP precludes all other actions.

If the TMP doesn't file a petition by the 90th day from the date the FPAA was mailed, any other partner entitled to receive this notice {or any group of partners who together have an interest of five percent or more in the profits of the partnership (5 percent group)} may petition one of these courts after the 90th day, but on or before the 150th day, from the date the FPAA was mailed to the TMP. If more than one petition is filed, the first petition filed in the Tax Court will go forward. All other petitions (even those filed earlier in one of the other courts) will be dismissed. If no petition is filed in the Tax Court, the first petition filed in one of the other courts will go forward and subsequent petitions will be dismissed.

Petitions filed with the United States Tax court must be mailed to:

United States Tax Court
400 Second Street, NW
Washington, DC 20217

Attach a copy of this letter to the petition. The time in which you must file a petition with the court is fixed by law and the court cannot consider your case if your petition is filed late. If this letter is addressed to both a husband and wife, and both want to petition the Tax Court, both must sign the petition or each must file a separate, signed petition.

As a condition to filing a petition in either the appropriate District Court or the Court of Federal Claims, the partner filing the petition (including each member of a 5 percent group that files a petition) must deposit the amount by which the partner's tax liability would be increased if the treatment of the partnership items of the partnership on the partner's return were made consistent with the treatment of the partnership items under the FPAA. If you reported the partnership items of the partnership the way the partnership reported them on its return, you can generally determine the amount to deposit by taking your pro rata share of the partnership adjustments into account in recomputing your tax. You must deposit this amount with IRS on or before the day you file your petition.

## 3. If you do nothing:

If no readjustment petition is filed in any of the courts listed in this letter, the FPAA becomes binding, and we will bill you for any additional tax plus interest that you may owe under the FPAA. You won't be permitted to contest the treatment of the partnership items of the partnership under the FPAA in any refund claim or suit. The law permits us to bill you after 150 days from the mailing date

Letter 1830(DO) (Rev. 10-93)

of the FPAA to the TMP. However, if a petition is filed in the Tax Court, we won't bill you until the Tax Court decision is final.

You may wish to contact the TMP of the partnership or your tax advisor to discuss this matter.

If you have any questions, please write to the person whose name and address are shown in the heading of this letter. If you write, attach a copy of this letter to help identify your account. Also include your telephone number and the most convenient time for us to call you in case we need additional information.

If you prefer, you may call the IRS contact person at the telephone number shown in the heading of this letter. If this number is outside your local calling area, there will be a long distance charge to you.

Thank you for your cooperation.

Sincerely,

*Jeffrey J. Basalla (by m)*

Jeffrey J. Basalla
Director, Field Compliance Area 6
Small Business/Self-Employed

Enclosures:
Form 870-PT
Copy of this letter

Letter 1830(DO) (Rev. 10-93)

| Form **870-PT**<br>(08-2001) | DEPARTMENT OF THE TREASURY — INTERNAL REVENUE SERVICE<br>**Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts** | IN REPLY<br>REFER TO:<br>S:C:CS:CM:TT:E:6:E14 |
| --- | --- | --- |

| Taxpayer name(s), address and ZIP code:<br><br>Ervin Capital, LLC<br>Attention: Robert Wayne Ervin<br>450 Pryor Boulevard, P.O. Box 409<br>Sturgis, KY 42459<br><br>Taxpayer Identifying Num███████ | Name of Partnership:<br>Jade Trading, LLC<br><br>Taxpayer Identifying Number:<br>13-4079142<br><br>Name of Tax Matters Partner:<br>Sentinel Advisors, LLC, TMP | Tax Year(s) Ended:<br><br>December 31, 1999 |
| --- | --- | --- |

## Offer of Agreement to Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts
## &
## Waiver of Restrictions on Assessment for Partnership Items, Penalties, Additions to Tax, and Additional Amounts

Under sections 6224(c) and 7121 of the Internal Revenue Code of 1986, the Commissioner of the Internal Revenue Service and the undersigned taxpayer(s) agree to the determination of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items as shown on the attached schedule of adjustments.

The undersigned taxpayer(s), in accordance with sections 6224(b) and 6213(d), also waives the restrictions provided by sections 6225(a) and 6213(a) and consents to the assessment and collection of any deficiency attributable to adjustments to partnership items, penalties, additions to tax and additional amounts that relate to adjustments to partnership items, as set forth in the attached schedule of adjustments; plus any interest provided by law.

This agreement is conditional and will not become effective or final until this agreement form is returned to the Commissioner and is signed on his or her behalf. The one-year extension of the period of limitations on assessments under section 6229(f) will not begin to run until the date the Commissioner's representative signs this form on the Commissioner's behalf.

If this part of this agreement form is signed for the Commissioner, the treatment of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items under this agreement will not be reopened in absence of fraud, malfeasance, or misrepresentation of fact. In addition, no claim for an adjustment of partnership items, refund or credit based on any change in the treatment of partnership items or partnership level determinations as to penalties, additions to tax and additional amounts may be filed or prosecuted.

| Signature of Taxpayer | | Date Signed |
| --- | --- | --- |
| Signature of Taxpayer | | Date Signed |
| By (Signature and Title) | | Date Signed |

| FOR<br>INTERNAL<br>REVENUE<br>USE ONLY | Date accepted for Commissioner | Signature |
| --- | --- | --- |
| | Office | Title |

| Cat. No. 57315A | www.irs.gov | (See Instructions for Signing Agreement) | Form **870-PT** (Rev. 8-2001) |
| --- | --- | --- | --- |

## INSTRUCTIONS FOR SIGNING THIS AGREEMENT

    If a JOINT RETURN OF A HUSBAND AND WIFE was filed and both spouses intend to agree, both spouses must sign Form 870-PT. One spouse may sign as agent for the other, if acting under a power of attorney.

2.    If the taxpayer is a corporation, the agreement must be signed with the corporate name followed by the signature and title of the officer authorized to sign Form 870-PT.

3.    Your attorney or agent may sign for you if this action is specifically authorized by a power of attorney, which if not previously filed, must accompany this form.

4.    If this offer is signed by a Tax Matters Partner, please include the title with the signature.

Department of the Treasury - Internal Revenue Service
### Agreement to Assessment and Collection of
### Deficiency in Tax for Partnership Adjustments

### Schedule of Adjustments

| Name of Partnership:<br><br>JADE TRADING LLC  % SENTINEL ADVISO<br><br>Taxpayer Identification Number:  13-4079142 | Tax Year(s) Ended: | | |
|---|---|---|---|
| | 12/31/1999 | | |
| **Detail of Adjustments to Ordinary Income:** | | | |
| a. Other deductions | | | |
| b. | | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| **Total Adjustments to Ordinary Income** | | | |
| **Other Adjustments** | ************************ | ************************ | ************************ |
| a. Other income (loss) | ************************ | ************************ | ************************ |
|   (1)  Adjustment | 314,416.00 | | |
|   (2)  As reported | (292,015.00) | | |
|   (3)  Corrected | 22,401.00 | | |
| c. Other deductions | ************************ | ************************ | ************************ |
|   (1)  Adjustment | 0.00 | | |
|   (2)  As reported | 11,273.00 | | |
|   (3)  Corrected | 11,273.00 | | |

**Remarks:**


See attachment for "Explanation of Adjustments – Jade Trading, LLC."

See attachment for "Information Regarding Additions to Tax (Penalties) and Affected Items."


RGS ver. 3.20.00                                                                                      Form 870-P

Name:  JADE TRADING LLC  % SENTINEL ADVISORS LLC       Page    of
TIN:   13-4079142                                             199912

## Form 870-P – Other Adjustments (Continued)

| | Year: 12/31/1999 | Year: | Year: |
|---|---|---|---|
| c. Distributions - property other than money | ************************ | ************************ | ************************ |
| (1) Adjustment | (398,279.00) | | |
| (2) As reported | 398,279.00 | | |
| (3) Corrected | 0.00 | | |
| (1) Adjustment | ************************ | ************************ | ************************ |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | ************************ | ************************ | ************************ |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | ************************ | ************************ | ************************ |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | ************************ | ************************ | ************************ |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | ************************ | ************************ | ************************ |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | ************************ | ************************ | ************************ |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | ************************ | ************************ | ************************ |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | ************************ | ************************ | ************************ |
| (2) As reported | | | |
| (3) Corrected | | | |
| (1) Adjustment | ************************ | ************************ | ************************ |
| (2) As reported | | | |
| Corrected | | | |

RGS Ver. 3.20.00                                        Form 870-P (continued)

## Explanation of Adjustments – Jade Trading, LLC

1. It is determined that Jade Trading, LLC, is a sham and, under §1.701-2, was formed or availed of in connection with a transaction or transactions in taxable year 1999, a principal purpose of which was to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code. It is consequently determined that the partnership is disregarded and that all transactions engaged by Jade Trading, LLC, are treated as engaged in directly by the purported partners. This includes the determination that the Euros and Xerox stock purportedly acquired by the partnership were acquired directly by purported partners Ervin Holdings, LLC, Ervin Capital, LLC, and Ervin Investments, LLC.

2. It is determined that, under §1.701-2 of the Treasury Regulations, Euro currency options, purportedly contributed to or assumed by the partnership, are treated as never having been contributed to or assumed by the partnership and any gains or losses purportedly realized by the partnership on the options are treated as having been realized by the purported partners Ervin Holdings, LLC, Ervin Capital, LLC, and Ervin Investments, LLC.

3. It is further determined that, under §1.701-2 of the Treasury Regulations, Ervin Holdings, LLC, Ervin Capital, LLC, and Ervin Investments, LLC, should be treated as not being partners in the partnership.

4. It is further determined that, under §1.701-2 of the Treasury Regulations, contributions to the partnership will be adjusted to reflect clearly the partnership's or partners' income.

5. Even if Euro currency options were to be treated as contributed to the partnership, the bases of the options are reduced, both in the hands of the contributing partners and the partnership, by any amount received by the contributing partner from the contemporaneous sale of a substantially similar option to the same counter-party. Thus, any amount treated as an increase in outside basis from the contribution of Euro currency options is disallowed.

6. Accuracy-Related Penalties

   It is determined that the underpayment of tax for the taxable year 1999 is due to a gross valuation misstatement of the adjusted basis in the partners' basis in their partnership interest and the consequent basis in the Euros and Xerox stock distributed to partners to which their partnership basis attached. Therefore, the 40 percent penalty is imposed on the underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(3), 6662(e) and 6662(h) of the Internal Revenue Code.

Alternatively, it is determined that all or part of the underpayment of tax for the taxable year 1999 is due to negligence or disregard of rules and regulations for filing income tax returns. Consequently, the 20 percent penalty is imposed on the underpayment attributable to negligence or disregard of rules and regulations as provided by Sections 6662(a), 6662(b)(1), 6662(c) of the Internal Revenue Code.

Alternatively, it is determined that the underpayment of tax for the taxable year 1999 is due to an underpayment attributable to substantial understatement of income tax. Consequently, the 20 percent penalty is imposed on the underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(2), 6662(c) of the Internal Revenue Code.

Alternatively, it is determined that the underpayment of tax for the taxable year 1999 is a substantial understatement of income tax because the transaction is a tax shelter, no substantial authority has been established for the position taken, and there was no reasonable belief upon the filing of the return that the position taken was more likely than not the correct treatment of the transaction. Consequently, the 20 percent penalty is imposed on the underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(2), 6662(c) of the Internal Revenue Code.

9

## Information Regarding Additions to Tax (Penalties) and Affected Items

The Internal Revenue Code provides, in appropriate cases, for the application of accuracy related penalties under section 6662, which include, in part, penalties for negligence or disregard of rules or regulations, substantial understatement of income tax, and substantial valuation misstatements.

Under Internal Revenue Code section 6230(a)(2), for taxable years ending before August 6, 1997, penalties require a partner level determination and are separately determined and assessed after the outcome of the partnership proceeding. Upon the completion of the partnership proceeding or the execution of a Form 870-P, you may be sent an examination report and/or a statutory notice of deficiency asserting partner level penalties.

For partnership taxable years ending before August 6, 1997, a court will not have jurisdiction to consider such partner level penalties raised in a petition with respect to a notice of Final Partnership Administrative Adjustment (FPAA) pursuant to Internal Revenue Code section 6226(f). Thus, you should not raise any penalty should you decide to petition an FPAA to the Tax Court, Claims Court or a district court for a partnership taxable year ending before August 6, 1997.

For partnership taxable years ending after August 5, 1997, penalties are determined at the partnership level and may be agreed to as part of the partnership proceeding. A court will have jurisdiction over partnership level penalties raised in an FPAA petition for a partnership taxable year ending after August 5, 1997. Any partner level defense to partnership level penalty determinations, however, may only be raised through refund claims following the assessment and collection of such penalties.

For all partnership taxable years, other items affected by partnership adjustments, "affected items," may also be separately determined and assessed after the outcome of the partnership proceeding. Upon the completion of the partnership proceeding or the execution of a Form 870-PT (Form 870-P for tax years ending before August 6, 1997), you may be sent an examination report and/or a statutory notice of deficiency asserting affected items.

**Please note:** This is an information item only, and is not part of the notice of Final Partnership Administrative Adjustment.